## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ERIC OPPER,                          :
                                     :   CIVIL ACTION
          Plaintiff                  :
                                     :
     vs.                             :
                                     :   NO. 18-CV-4230
FRED BEANS MOTORS OF                 :
DOYLESTOWN, INC., d/b/a AUTO         :
EXPRESS OF DOYLESTOWN,               :
                                     :
          Defendant                  :


## MEMORANDUM AND ORDER


**JOYNER, J.**                              **September 5, 2019**


     This civil, employment action has been brought before this
Court for disposition of the Motion for Summary Judgment of
Defendant, Fred Beans Motors of Doylestown, Inc., d/b/a Auto
Express of Doylestown.  After careful review of the record
evidence in this action, the Motion shall be GRANTED IN PART and
DENIED IN PART.

### Factual Background

     On or about January 2, 2017, Plaintiff, Eric Opper began
working as an automotive repair technician for Defendant Fred
Beans Motors of Doylestown at its Auto Express location at 838
Easton Road in Doylestown, Bucks County, Pennsylvania.  (Pl's
Compl., ¶s 8, 12; Def's Statement of Undisputed Material Facts

["Def's Statement"], ¶ 18).  At the time of his hire, Plaintiff
was 51 years old and had spent most of his working life, since
1984, in the automotive repair industry.  (Pl's Compl., ¶ 11;
Pl's Counterstatement of Material Facts ["Pl's
Counterstatement'], ¶ 1).

Fred Beans Motors and Auto Express are both owned by Fred
Beans Holdings, Inc., which is the parent company for some 19
automobile dealerships and other businesses, all of which have a
centralized Human Resources Department located at 3960 Airport
Boulevard in Doylestown, PA.  (Complaint, ¶ 8; Def's Statement,
¶s 1, 2; Declaration of Daniel Milewski, annexed as Exhibit "A"
to Def's Motion for Summary Judgment, ¶2; Deposition of Daniel
Milewski, annexed as Exhibit "E" to Pl's Response to Def's
Motion for Summary Judgment ("MSJ"), at p. 114-115).  At the
time of his hire, Plaintiff was paid at the rate of $15 per hour
whereby he was paid for the number of hours worked and not by
the job.  It was understood that if Plaintiff had a favorable
job review after he had worked 60 days, his rate of pay would
increase to $16 per hour.  Plaintiff in fact did receive a
positive 60-day review and the $16 per hour rate in March, 2017.
His hourly rate was again increased to $17 per hour two months
later, in June, 2017.  (Exhibit "A-4" to Def's MSJ).

It was also understood at the time of hire that Plaintiff
would obtain his certification to conduct Pennsylvania state

emissions inspections and that when he did so, he could command a higher rate of pay. Plaintiff secured his certification in August, 2017 and his rate was then increased to $19 on the "flat-rate"[1] pay plan. (Exhibit "A-4," Def's MSJ). Then, a few weeks later and on the basis of Plaintiff's reporting that he had another job offer from a nearby dealership, Plaintiff's hourly rate was again increased to $23 per flat-rate hour. (Exhibit "A-4" to Def's MSJ).

From all appearances, Plaintiff's job performance was good and thorough, although his production was described as "not better than average." (Exhibit "C" to Def's MSJ, Deposition of William Dannehower, at p. 67). He received favorable performance reviews from his supervisor, William Dannehower, with comments such as: "If every technician was as detailed as Eric, we would be able to deliver the best service;" "Eric does not give up! He will research until he finds the answer. He is Auto Expresses Trainer. He helps all the younger technicians;" and "on time, dependable, and good communication." (Exhibits "H" and "I" to Pl's Response to Def's MSJ).

---

[1] Under the "flat-rate" pay plan, auto repair technicians are paid a set amount of hours per repair order based upon pre-determined labor times. At Auto Express, these pre-determined labor times were set through the "ALLDATA" program, which would also provide instructions on how to best undertake a repair job. (Def's Statement, at ¶s 33-36). Thus, for example, if ALLDATA determined that an oil change should take an hour to perform and the auto repair technician was able to perform the job in a half hour, the technician would be paid for an hour of time, with the converse being true: if a half-hour job took an hour to complete, the technician would only be compensated for half an hour. (Def's Statement, ¶s 14-15).

After Plaintiff's compensation structure was changed from hourly to the flat-rate system, it was Plaintiff's understanding that he was to be credited with 5/10 (1/2) of an hour pay for assisting other technicians with their repair jobs. Plaintiff also came to believe that he wasn't being fully compensated under the flat-rate system for the work he was performing and he began to complain about his pay to his co-workers. (Exhibit "D" to Def's MSJ [Plaintiff's Deposition], pp. 169-187). At times, these complaints took the form of Plaintiff yelling and screaming about his hours being terrible and not being treated fairly, swearing and throwing tools. (Exhibit "B" to Def's MSJ, ¶ 7; Exhibit "F" to Def's MSJ [Deposition of Jeffrey Pursell], pp. 50-55; Exhibit "H" to Def's MSJ, pp. 24-26).

On March 31, 2018, Plaintiff registered an anonymous complaint with Lighthouse Services, Inc., Fred Beans' outside ethics/employee reporting hotline, against one of Auto Express' Assistant Service Managers, Nicholas Burella. Specifically, Plaintiff alleged that Burella had groped him twice and that he had witnessed Burella groping some other employees as well. Plaintiff's Lighthouse report also stated that Plaintiff "told him [Burella] to never touch me again and that it's assault…. I have noticed that my scheduled hours and flat rate hours are going down since this happened. There are also flat rate hours that are unaccounted for as well." (Exhibit "A-5" to Def's

MSJ).  Plaintiff also lodged a private criminal complaint

against Burella with the Plumstead Township Police Department,

which initiated an investigation.

Promptly upon receipt of Plaintiff's complaint, Fred Beans

Human Resources Director Dan Milewski also commenced an

investigation, meeting with William Dannehower, who in addition

to being Plaintiff's supervisor was Auto Express' general

manager, and subsequently individually interviewing Plaintiff,

Burella, Auto Express' other Assistant Service Manager ("ASM")

Jeffrey Pursell, and the other auto repair and lube technicians

with whom Plaintiff worked.  (Exhibits "A-6" – "A-16" to Def's

MSJ).  At the conclusion of the investigation, Fred Beans'

management had just one employee (other than Plaintiff) who

variously stated: (1) that he saw Burella touch Plaintiff "in an

inappropriate way;" and (2) that he "saw something out of the

corner of his eye" but "was not sure what happened when Nick was

passing by Eric."  (Exhibit "A-13 to Def's MSJ; Exhibit "H" to

Def's MSJ, pp. 27-28, 31-335, ). Burella denied ever touching

Plaintiff or anyone else inappropriately or ever touching

Plaintiff or anyone else intentionally.  All of the other

employees denied having seen or having any knowledge that

Plaintiff had been groped or knowledge of any other

inappropriate physical contact between any of the employees or

between Burella and any of the employees, although most of those

interviewed stated that all of them (including Plaintiff) had talked and joked about matters of a sexual nature. (Exhibits "A-6" – "A-16" to Def's MSJ).

As a consequence, the only discipline that Burella was given by Fred Beans was a written warning and then he and the entire Auto Express staff were required to again undergo sexual harassment training and training regarding proper workplace behavior. (Exhibits "A-17" – "A-18"). At the conclusion of the police inquiry, the investigating Plumstead Township police officer and the Bucks County district attorney deemed there to be insufficient evidence to justify the filing of criminal charges[2], and that matter was closed.

Subsequent to the closing of the investigations into his complaint, Plaintiff came to believe that, in addition to not being properly credited for the work he was doing, Burella was not giving him work and/or was giving jobs that should have been Plaintiff's to other repair technicians. (Exhibit "D" to Def's MSJ, pp. 230-233, 312-314). On the evening of April 27, 2018, an incident occurred after ASM Jeff Pursell read Plaintiff his

---

[2] In response to the investigating police officer's interview, the one employee who had advised Daniel Milewski that he had seen Burella touch Plaintiff in an inappropriate manner and who told William Dannehower that he thought he might have seen something out of the corner of his eye, testified in his deposition that his memory was "foggy" about what he had seen and told the police because the incident/investigation stressed him. He does recall telling the officer about Nick standing next to Eric and then moving and explaining to him the scenery but he doesn't "really recall anything other than that." (Exhibit "H" to Def's MSJ, pp. 61-68). In his deposition, however, he testified that he was certain that he had seen Burella touch Plaintiff inappropriately.

time sheet.  Plaintiff asked if a tire patch job was on the sheet for which Plaintiff believed he should be credited with 2/10 of an hour.  When Pursell responded that the job was not on Plaintiff's time sheet, a discussion ensued between the two with Plaintiff waving his arms and, as reported to Dannehower, yelling that he "does not work for free," and "do you know how much these tools cost?" (Exhibit "A-19, "Exhibit "D" to Def's MSJ, pp. 319-328).  Dannehower issued Plaintiff a counseling form for the incident which specifically advised Plaintiff that if he had a concern or problem, he was to follow the chain of command and talk to a manager first.  The form also contained the following notation:

> Mr. Opper was told by Dan H/R that can not act this way.
> Mr. Opper will make sure this type of behavior never
> happens again.  Mr. Opper will treat all employees with
> respect.  This is a Final Warning.  If this happens again
> the result will be termination.

(Exhibit "A-19" to Def's MSJ).

A second counseling form was written on May 18, 2018 arising out of another incident of Plaintiff complaining that "he should have gotten a job that Matt got.  Eric told Matt he should have that job and Matt gave that job to Eric." (Exhibit "A-18," "D," pp. 330-350 to Def's MSJ).  On that occasion, William Dannehower again reminded Plaintiff that he "had been told that if he gets frustrated or feels being treated unfairly he needs to discuss with a manager." (Exhibit "A-20;" Exhibit

"C," [Dep. Of William Dannehower], pp. 90-92, 109-111, 113-117, 129-139). Then, on July 12, 2018, yet another incident was reported to Dannehower this time by Jeff Pursell that Plaintiff had yelled at him and was angry because he wasn't getting credited with more time for working on a Jaguar. Evidently, Plaintiff had failed to check the driver side rear caliper before putting new brakes on the passenger side. After the customer was notified, he elected to not replace the rear brakes at that time and Plaintiff was directed to put the old parts back on the vehicle. Plaintiff apparently began yelling at Pursell and demanding that he be credited with more time for the work that he had performed. As a result of this outburst, Plaintiff's employment was terminated on July 17, 2018. (Exhibits "A-21 – A-22;" Exhibit "C," pp. 143-156 to Def's MSJ).

Plaintiff subsequently commenced this lawsuit on October 2, 2018 pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000d, *et. seq.*[3], the Age Discrimination in Employment Act, 29 U.S.C. §621, *et. seq.* ("ADEA"), the Pennsylvania Wage

---

[3] The court surmises that Plaintiff's complaint contains a typographical error insofar as §2000d is entitled "**Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin**" and provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Rather, we assume that Plaintiff is advancing his claims under 42 U.S.C. § 2000e, *et. seq.* governing equal employment opportunities in general.

Payment and Collection Law, 43 P.S. §260.3(a) – (b)("WPCL"), and under Pennsylvania common law for wrongful discharge. Inasmuch as discovery in this matter has now closed, Defendant filed for summary judgment on June 3, 2019.

## Summary Judgment Standards

The fundamental principles governing motions for summary judgment are articulated in Fed. R. Civ. P. 56, subsection (a) of which provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

It is axiomatic that in considering a motion for summary judgment, a reviewing court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Burton v. Teleflex, Inc., 707 F.3d 417, 425 (3d Cir. 2013); Roth v. Norfalco, LLC, 651 F.3d 367, 373 (3d Cir. 2011). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"

El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986)).  An issue of fact is material and genuine if it "affects the outcome of the suit under the governing law and could lead a reasonable jury to return a verdict in favor of the nonmoving party."  Parkell v. Danberg, 833 F.3d 313, 323 (3d Cir. 2016)(quoting Willis v. UPMC Children's Hospital of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015)).

Further, inferences must flow directly from admissible evidence.  Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). In order to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence – there must be evidence on which a jury could reasonably find for the non-movant.  Burton, supra,(quoting Jakimas v. Hoffman-LaRoche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)).

## Discussion

As noted above, Plaintiff here is advancing two claims of employment discrimination under federal law and two claims under Pennsylvania state law – one under common law and one statutory.[4] We address each claim *seriatim*.

---

[4] Plaintiff also avers in his complaint that he is likewise seeking redress for Defendant's alleged violations of the Pennsylvania Human Relations Act, 43 P.S. §951, *et. seq.* but because he is required to wait 1 full year under that Act before initiating a lawsuit from the date of dual-filing with the EEOC (Equal Employment Opportunity Commission), those claims are premature and are not presently before this Court. Plaintiff submits, however, that his PHRA claims will mirror his federal claims under Title VII and the ADEA. (See footnote 1 to Pl's Complaint).

*A. Count I – Title VII Sexual Harassment, Retaliation*

For his first cause of action, Plaintiff alleges that he was sexually harassed by Burella, that he was subjected to a sexually hostile work environment and that he was retaliated against for filing a complaint of sexual harassment.  As we explained in footnote 3 above, we presume that Plaintiff is proceeding under 42 U.S.C. §2000e-2 which renders certain employment practices unlawful.  Subsection (a) of that statute states the following:

**(a)** **Employer practices.**  It shall be an unlawful employment practice for an employer –

(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

This provision not only prohibits discrimination with respect to employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts, but also outlaws the creation or perpetuation of a discriminatory work environment.  <u>Vance v. Ball State University</u>, 570 U.S. 421, 426, 133 S. Ct. 2434, 2440, 186 L. Ed.2d 565 (2013).

1.  <u>Sexual Harassment – Hostile Work Environment</u>

The Supreme Court has made it clear that "[w]hen the
workplace is permeated with discriminatory intimidation,
ridicule, and insult that is sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an
abusive working environment, Title VII is violated." <u>Harris v.
Forklift Systems, Inc.</u>, 510 U.S. 17, 21, 114 S. Ct. 367, 370,
126 L. Ed.2d 295 (1993)(citing <u>Meritor Savings Bank, FSB v.
Vinson</u>, 477 U.S. 57, 65, 67, 106 S. Ct. 2399, 2405, 91 L. Ed.2d
49 (1986)).  On the other hand, "[c]onduct that is not severe or
pervasive enough to create an objectively hostile or abusive
work environment – an environment that a reasonable person would
find hostile or abusive – is beyond Title VII's purview."  <u>Id.</u>
Stated otherwise, "an unpleasant work environment is not a good
thing, but it is not necessarily actionable either" unless it is
"permeated with discriminatory intimidation, ridicule and insult
that is sufficiently severe or pervasive to create an abusive
working environment."  <u>Burgess v. Dollar Tree Stores, Inc.</u>, No.
15-1544, 642 Fed. Appx. 152, 155, 2016 U.S. App. LEXIS 2185 (3d
Cir. Feb. 9, 2016)(quoting <u>Harris v. Forklift Systems</u>, 510 U.S.
at 21).  "The plaintiff must subjectively perceive the
environment to be hostile or abusive, and conditions must be
such that a reasonable person would have the same perception."

Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715 (3d Cir. 1997)(citing Harris, 510 U.S. at 21).

"Male as well as female employees are protected against discrimination." Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 682, 103 S. Ct. 2622, 2630, 77 L. Ed.2d 89 (1983). Likewise, same-sex sexual harassment claims are also cognizable under Title VII and it is particularly noteworthy that the [harassing] "conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79, 118 S. Ct. 998, 1001-1002, 140 L. Ed.2d 201 (1998).

Generally speaking, "[t]o succeed on a hostile work environment claim, the plaintiff must establish that (1) the employee suffered intentional discrimination because of his/her sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." Id. (citing Huston v. Procter & Gamble Paper Products, Corp., 568 F.3d 100, 104 (3d Cir. 2009)).

Recognizing the difficulty inherent in proving that same-sex harassment is "because of sex," the Third Circuit has provided examples by pointing to "several situations in which same-sex harassment can be seen as discrimination because of sex." Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 262 (3d Cir. 2001). These include:

> where there is evidence that the harasser sexually desires the victim, such as where a gay or lesbian supervisor treats a same-sex subordinate in a way that is sexually charged; (2) where there is no sexual attraction but where the harasser displays hostility to the presence of a particular sex in the workplace, such as where a male doctor believes that men should not be nurses and treats male nurses with hostility amounting to harassment; or (3) where the harasser's conduct is motivated by a belief that the victim does not conform to the stereotypes of his or her gender, such as where a woman is denied partnership by male partners who then advise her that she should walk, talk, and dress more femininely and wear make-up if she wished to improve her chances for partnership.[5]

Betz v. Temple Health Systems, No. 16-1423, 659 Fed. Appx. 137, 143, 2016 U.S. App. LEXIS 18158 (3d Cir. Oct. 6, 2016)(citing Bibby, 260 F.3d at 262-263). Regardless of "whatever evidentiary route a plaintiff takes, he or she must 'always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted' discrimination because of gender." Id,(quoting Oncale, 523 U.S. at 81 and Bibby, 260 F.3d at 264).

---

[5] Bibby also gave as an alternative example of same-sex harassment an incident "where co-workers verbally and physically harassed a young man because he wore an earring, repeatedly asked him whether he was a girl or a boy, and threatened to assault him sexually." 260 F.3d at 263.

In determining whether an environment is "hostile" or "abusive," all of the circumstances must be examined, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance."  In re Tribune Media Co., 902 F.3d 384, 399 (3d Cir. 2018).

Moreover, the basis of an employer's liability for a hostile work environment claim depends on whether the harasser is the victim's supervisor or coworker.  Mandel, 706 F.3d at 169(citing Huston, 568 at 104).  Where the harassing employee is the plaintiff's "supervisor," an employer may be vicariously liable for its employee's creation of a hostile work environment and, in identifying the situations in which such vicarious liability is appropriate, the Restatement of Agency is properly consulted for guidance.  Vance, 570 U.S. at 428, 133 S. Ct. at 2441.  Applying Section 219(2)(d) of that Restatement (which recognizes that liability may exist when the servant is "aided in accomplishing [his]tort by the existence of the agency relation"), the Vance court observed that an employer may be strictly liable (1) when a supervisor makes a tangible employment decision or (2) if the employer is unable to establish an affirmative defense by showing, for example, that it exercised reasonable care to prevent or promptly correct any

harassing behavior and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided.  <u>Id</u>, 570 U.S. at 429(citing <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed.2d 633 (1998) and <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed.2d 662 (1998)).

Similarly, "[e]mployers are liable for the actions of a plaintiff's non-supervisory coworkers 'only if (1) the employer failed to provide a reasonable avenue for complaint or (2) the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.'"  <u>LaRochelle v. Wilmac Corp.</u>, No. 17-3349, 769 Fed. Appx. 57, 61, 2019 U.S. App. LEXIS 11695 (3d Cir. April 22, 2019)(quoting <u>In re Tribune</u>, 902 F.3d at 400).  "Thus, if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and remedial action, the employer will be liable." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990)(citing <u>Katz v. Dole</u>, 709 F.2d 251, 255 (4th Cir. 1983)). And, to avoid liability, the employer must demonstrate that its supervisory employees investigated plaintiff's complaints and took appropriate action to adequately curb the sexism in the workplace.  <u>Id</u>.

In this case, viewing the evidence in the record before us in the light most favorable to Plaintiff and drawing all inferences in his favor, we find that there exists a genuine issue of material fact as to whether Plaintiff was touched inappropriately by Burella on one and possibly, another occasion if Plaintiff's uncorroborated testimony is accepted by a jury. Regardless however, there is **no** evidence on this record as to a motive behind Burella's behavior and there is nothing in the record to suggest that Plaintiff was groped *because of* his sex. By Plaintiff's own admission "he has no idea what [Burella] was thinking," and there simply is no documentary or testamentary evidence evincing that Burella was sexually attracted to Plaintiff, hostile to him because of his gender or treated Plaintiff negatively because he believed that he was not exhibiting qualities typically attributed to a stereotypical man. (Exhibit D to Def's MSJ, at p. 225).

Further, while this Court does not doubt that the inappropriate touching had a detrimental effect on Plaintiff, as it likely would on any reasonable person, we cannot find that it was so severe or pervasive as to render the workplace "an abusive environment" nor is there evidence that it interfered with Plaintiff's job performance. Again, giving the plaintiff the benefit of the doubt and viewing his evidence in the light most favorable to him, it is one or at most two incidents

occurring on one day of which he is complaining.  And, in light
of the fact that the Auto Express repair and lube technicians -
including the plaintiff himself - would frequently talk and make
jokes about sexual matters in the shop while they were working,
the record strongly suggests that the two incidents at issue
were the type of "ordinary socializing in the workplace – such
as male-on-male horseplay or intersexual flirtation" which the
Supreme Court in Oncale held should not be mistaken "for
discriminatory conditions of employment."  Oncale, 523 U.S. at
81, 118 S. Ct. at 1003.

Additionally, as soon as the report which Plaintiff made to
Defendant's outside ethics hotline came to light, Defendant's HR
Coordinator immediately began investigating.  In the process of
that investigation, Mr. Milewski promptly called in William
Dannehower, Auto Express' general manager and informed him that
a sexual harassment complaint had been filed and told him what
had been alleged to have happened.  Dannehower had no knowledge
of any improper behavior; he and Milewski met with Plaintiff on
April 2, 2018 and Milewski subsequently individually interviewed
all of the auto repair and lube technicians in an effort to
determine what, if anything, had occurred.  In the course of
these interviews, only one other employee stated that he may
have seen Burella touch Plaintiff's genital area when Plaintiff
was standing by the front counter to the service area.  None of

the other employees interviewed saw or experienced Burella touch
them or any other employee but many of them acknowledged that
they and numerous other employees, including Plaintiff, would
talk and joke about matters of a sexual nature in the workplace.
Burella himself strenuously denied ever touching Plaintiff or
any other employee.  Because Milewski could not definitively
determine that Burella had done what Plaintiff had accused him
of doing, he issued a written warning for placement in his
personnel file and required Burella and all of the employees to
undergo retraining on sexual harassment and appropriate
workplace behavior.

In undertaking these actions and regardless of whether
Burella was a supervisory or co-employee to Plaintiff, we find
that Defendant exercised reasonable care to promptly address the
allegations of harassing behavior and took appropriate remedial
measures to prevent such behavior from occurring in the future.
In light of this evidence, we conclude that Plaintiff has failed
to make out a claim for sexual harassment on the basis of a
hostile work environment.  Accordingly, summary judgment shall
be entered on this claim in favor of Defendant.


2. Retaliation

Plaintiff also asserts that his termination was in retaliation for his making a report of sexual harassment against Burella. In making this claim, Plaintiff invokes Section 704 (a) of Title VII, the so-called "anti-retaliation provision," which is set forth at 42 U.S.C. §2000e-3(a) and reads as follows:

> **(a)** **Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.** It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C. §§2000e-2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

"The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2415, 165 L. Ed.2d 345 (2006)(citing Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed.2d 808 (1997)). "It does so by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." Id.

"A prima facie case of illegal retaliation requires a
showing of '(1) protected employee activity; (2) adverse action
by the employer either after or contemporaneous with the
employee's protected activity; and (3) a causal connection
between the employee's protected activity and the employer's
adverse action.'"  EEOC v. Allstate Insurance Co., 778 F.3d 444,
449 (3d Cir. 2015)(quoting Fogelman v. Mercy Hospital, 283 F.3d
561, 567-568 (3d Cir. 2002)); Estate of Oliva ex rel. McHugh v.
State of New Jersey, 604 F.3d 788, 798 (3d Cir. 2010); Robinson
v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997).  All
retaliation and discrimination claims brought under Title VII,
including those based on sex, which rely on circumstantial
evidence, are controlled by the three-step burden shifting
framework set forth in McDonnell Douglas Corp. v. Green, 411
U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).  Tourtellotte
v. Eli Lilly & Co., No. 15-1090, 636 Fed. Appx. 831, 841, 2016
U.S. App. LEXIS 521, *21 (3d Cir. Dec. 7, 2015).  This framework
requires that the plaintiff first establish a prima facie case
of discrimination or retaliation.  Id, 636 Fed. Appx. at 842.
If the plaintiff successfully meets the requirements of a prima
facie case, the burden then shifts to the employer to articulate
a legitimate, nonretaliatory or nondiscriminatory reason for its
actions.  Id. If the employer produces such a reason, the burden
then shifts back to the plaintiff to prove that the employer's

nonretaliatory or nondiscriminatory explanation is merely a
pretext for the discrimination or retaliation.  <u>Id</u>.(citing
<u>McDonnell Douglas</u>, 411 U.S. at 802-804; <u>Atkinson v. Lafayette</u>
<u>College</u>, 460 F.3d 447, 454 (3d Cir. 2006)).

"Unlike the antidiscrimination provision, the
antiretaliation provision is not limited to employer action that
affects the terms and conditions of a claimant's employment."
<u>Komis v. Secretary of the United States Department of Labor</u>, 918
F.3d 289, 293 (3d Cir. 2019).  Indeed, "[a]n employer can
effectively retaliate against an employee by taking actions not
directly related to his employment or by causing him harm
*outside* the workplace." <u>Id</u>,(quoting <u>Burlington Northern</u>, 548
U.S. at 63).  "To make out a claim of retaliation, a private-
sector plaintiff must show 'that a reasonable employee would
have found the challenged action materially adverse, which in
this context means it well might have dissuaded a reasonable
worker from making or supporting a charge of discrimination."
<u>Id</u>,(quoting <u>id</u>).

In this case, we find that adequate evidence exists on this
record to warrant the conclusion that a prima facie case of
discriminatory retaliation has been made.  Here, it is clear
that Plaintiff made a report of sexual harassment to Defendant's
outside ethics hotline on March 18, 2018, that shortly

thereafter on April 27, 2018, Plaintiff was written up and counseled by William Dannehower for the first time for an outburst with Jeffrey Pursell.  That was followed by a second write-up by Dannehower on May 18, 2018 again for an incident between Plaintiff, Pursell and Burella which Dannehower marked as a "final" warning, with a third write-up occurring on July 17th for an outburst "on 7/11 & 7/12/18 … as noted by Jeff Pursell at the front desk again."  (Exhibit "Z" to Pl's Response to Def's MSJ).  Concurrent with the issuance of this third counseling form, Plaintiff was terminated from his employment with Defendant. Given the temporal proximity between Plaintiff's undertaking the protected activity, the commencement of the write-ups by Dannehower and his eventual termination some 3 months later, we find that a prima facie case has been shown. See, e.g., Daniels v. School District of Philadelphia, 776 F.3d 181, 196 (3d Cir. 2015)(holding that "broad array of evidence" is properly considered in determining whether sufficient causal link exists, and that in addition to temporal proximity this may include "any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action"); Pearson v. Secretary, Department of Corrections, 775 F.3d 598, 604 (3d Cir. 2015)("while temporal proximity is often

important to establish retaliation, the mere passage of time is not legally conclusive proof against retaliation"; <u>Woodson v. Scott Paper Co.</u> 109 F.3d 913, 920 (3d Cir. 1997)("temporal proximity between the protected activity and the termination is sufficient to establish a causal link").

Of course, the inquiry does not end with the making-out of a prima facie case.  Again, subsequent thereto, the burden shifts to the Defendant to produce evidence demonstrating that the employment decision was motivated by a legitimate, non-discriminatory reason.  Here, Fred Beans asserts that Plaintiff was terminated because of his repeated outbursts of anger and frustration and for his failure to bring his complaints to his manager, (William Dannehower) and to otherwise follow the "chain of command."  There is support for this in the record as a result of the testimony of the various auto repair technicians who were deposed and the written statements/interview summaries of other technicians and lube specialists as well as from the deposition testimony of the plaintiff himself.  As a result, the presumption of unlawful discrimination created by the prima facie case disappears and the plaintiff once again resumes his burden of producing evidence which persuades the trier of fact that the true reason for the adverse employment action which he suffered was discrimination and that the reasons given by his

employer are a mere "pretext" for discrimination.  <u>Texas</u>
<u>Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 256,
101 S. Ct. 1089, 1095, 67 L. Ed.2d 207 (1981).  <u>See also</u>: <u>Reeves</u>
<u>v. Sanderson Plumbing Products, Inc.</u>, 120 S. Ct. 2097, 2109 and
<u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 509-510.

   In this regard, "[t]he plaintiff 'cannot simply show that
the employer's decision was wrong or mistaken' but rather 'must
demonstrate such weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's proffered
legitimate reason for its action that a reasonable factfinder
could rationally find them unworthy of credence, and hence infer
that the employer did not act for the asserted nondiscriminatory
reasons.'"  <u>Daniels</u>, 776 F.3d at 199(quoting <u>Ross v. Gilhulym</u>
755 F.3d 185, 194 n. 13 (3d Cir. 2014)).  To be sure, there are
two ways in which a plaintiff can prove pretext. "First, the
plaintiff can present evidence that 'casts sufficient doubt upon
each of the legitimate reasons proffered by the defendant so
that a factfinder could reasonably conclude that each reason was
a fabrication.'"  <u>Atkinson v. Lafayette College</u>, 460 F.3d 447,
454 (3d Cir. 2006) (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 762
(3d Cir. 1994).  "Second, and alternatively, the plaintiff can
provide evidence that 'allows the factfinder to infer that
discrimination was more likely than not a motivating or
determinative cause of the adverse employment action.'"  <u>Id</u>,

(quoting id). See also, Tourtellotte v. Eli Lilli & Co., supra, 636 Fed. Appx. at 852 (same).  In either of those events, it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Reeves, 530 U.S. at 147, 120 S. Ct. at 2108 (citing St. Mary's Honor Center, 509 U.S. at 511, 113 S. Ct. 2742).

In rebuttal of Fred Beans' proffered reason for his termination, Plaintiff asks the Court to infer retaliatory motive from Defendant's failure to take any disciplinary actions against him *before* he registered his sexual harassment complaint against Burella (despite his having had outbursts prior thereto), and from the fact that neither Daniel Milewski nor William Dannehower could recall terminating any other employee in the preceding ten years.  This matter is an extremely close call particularly in view of the fact that subsequent to Plaintiff's harassment complaint, Dannehower counseled Plaintiff to follow the chain of command in registering any complaints about his treatment in the workplace.  However, in giving Plaintiff the benefit of all potential and reasonable inferences we agree that it is possible that a factfinder could interpret the foregoing facts in such a manner as to find that they cast doubt upon the veracity of Defendant's articulated reasons. See, St. Mary's Honor Center, 509 U.S. at 511, 113 S. Ct. at 2749 (factfinder's disbelief of reasons put forward by defendant

particularly if disbelief accompanied by suspicion of mendacity

may, together with elements of prima facie case, suffice to show

intentional discrimination).  Consequently, we shall deny the

motion for summary judgment on Plaintiff's retaliation claim in

order to permit a jury to make this assessment.

     *B. Count II – Age Discrimination: Hostile Work Environment,*
       *Retaliation*

    In Count II of his Complaint, Plaintiff also claims that

Defendant discriminated against him on the basis of his age,

that he was subjected to an ageist hostile work environment and

that he was disciplined, treated differently than his younger

co-workers, and ultimately terminated in retaliation for his

having reported age-related discriminatory comments to H.R.

Director Milewski, all in violation of the Age Discrimination in

Employment Act, 29 U.S.C. §621, *et. seq.*  Indeed, under 29

U.S.C. §623(a),

      It shall be unlawful for an employer –

      (1)  to fail or refuse to hire or to discharge any
           individual or otherwise discriminate against any
           individual with respect to his compensation,
           terms, conditions, or privileges of employment,
           because of such individual's age;

      (2)  to limit, segregate, or classify his employees in
           any way which would deprive or tend to deprive
           any individual of employment opportunities or
           otherwise adversely affect his status as an
           employee, because of such individual's age; or

(3)  to reduce the wage rate of any employee in order
     to comply with this Act.

And, under Section 623(d),

     It shall be unlawful for an employer to discriminate
     against any of his employees or applicants for
     employment, for an employment agency to discriminate
     against any individual, or for a labor organization to
     discriminate against any member thereof or applicant
     for membership, because such individual, member or
     applicant for membership has opposed any practice made
     unlawful by this section, or because such individual,
     member or applicant for membership has made a charge,
     testified, assisted, or participated in any manner in
     an investigation, proceeding, or litigation under this
     Act.

Generally speaking, "[t]o prevail on an intentional age

discrimination claim under the ADEA …, a plaintiff must show

that his or her age 'actually motivated' or 'had a determinative

influence on' the employer's adverse employment decision."

Fasold v. Justice, 409 F.3d 178, 183-184 (3d Cir. 2005) (quoting

Reeves v. Sanderson, 530 U.S. at 141, 120 S. Ct. at 2105).

Indeed, the burden-shifting analysis set forth in McDonnell

Douglas is properly applied to ADEA claims for disparate

treatment and retaliation where there is no direct evidence of

discrimination.  Gavurnik v. Home Properties, L.P., No. 17-1256,

712 Fed. Appx. 170, 173, 2017 U.S. App. LEXIS 21092 (3d Cir.

Oct. 25, 2017).  Thus, a prima facie case of age discrimination

under the ADEA requires the plaintiff to plead and demonstrate

that: (1) the plaintiff is at least forty years old; (2) the

plaintiff suffered an adverse employment decision; (3) the

plaintiff was qualified for the position in question; and (4)
the adverse action occurred under circumstances that create an
inference that plaintiff's age was a motivating factor. Dodson
v. Coatesville Hospital Corp., No. 18-3065, 2019 U.S. App. LEXIS
16608 at *3 (3d Cir. June 3, 2019) (citing O'Connor v.
Consolidated Coin Caterers Corp., 517 U.S. 308, 310, 116 S. Ct.
1307, 134 L. Ed.2d 433 (1996)).

Additionally, to sustain a hostile work environment claim
under the ADEA, a showing must be made that the workplace was
"permeated with discriminatory intimidation, ridicule, and
insult that was sufficiently severe or pervasive to alter the
conditions of employment and create an abusive working
environment." Howell v. Millersville University of
Pennsylvania, No. 17-3538, 749 Fed. Appx. 130, 135, 2018 U.S.
App. LEXIS 25339 (3d Cir. Sept. 6, 2018) (quoting AMTRAK v.
Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed.2d 106
(2002)). Finally, to "state a prima face case of retaliation
under the ADEA, a plaintiff must show: (1) that he engaged in a
protected employee activity; (2) that he was subject to an
adverse action by the employer either subsequent to or
contemporaneous with the protected activity; and (3) that there
is a causal connection between the protected activity and the
adverse action." Lackey v. Heart of Lancaster Regional Medical
Center, No. 16-3986, 704 Fed. Appx. 41, 47, 2018 U.S. App. LEXIS

13596 (3d Cir. July 27, 2017) (quoting <u>Fasold v. Justice</u>, 409

F.3d at 188).  In other words, nearly identical principles and

standards govern Plaintiff's ADEA claim as were applied to his

Title VII cause of action.

In application, we first note that Plaintiff can certainly

satisfy the first three pre-requisites to establishing a prima

facie case of age discrimination in that he was 53 years old at

the time of his termination and he was clearly qualified for the

position in light of his years of experience, favorable

performance reviews and pay increases.[6]  After scouring the

record in this matter, however, we cannot find that Plaintiff

has made the requisite showing that a causal nexus exists

between the adverse employment actions suffered and his age.

Indeed, the sole evidence on this issue comes exclusively

from the deposition testimony of the plaintiff himself.

According to Mr. Opper, two of his co-workers told him he was an

"old man," who was "too slow" and that he "can't do this," asked

him "what the hell is wrong with you," and remarked and

questioned his ability to engage in sexual activity.  (Pl's

Dep., Exhibit "A" to Pl's Response in Opposition to Def's MSJ at

p. 384).  These remarks, which according to Plaintiff pre-dated

the filing of his sexual harassment complaint, were reported to

---

[6] Defendant also does not contest that Plaintiff was within the confines of
the protected class for purposes of the ADEA and that he was qualified for
the job which he held.

Bill Dannehower who "addressed it." (Pl's Dep., Exhibit "A," at pp. 384-386). By Plaintiff's own admission, none of his managers ever called him an old man and Plaintiff further acknowledged that Dannehower himself was a year or so older than he was, that Dannehower had hired him approximately a year and a half before he was terminated, and that Dannehower had given him numerous pay raises over the course of his employment. (Pl's Dep., pp. 382-387). Insofar as disparate treatment is concerned, Plaintiff has proffered nothing to show that he was treated differently than other, younger employees and has not identified any comparator. As a result, we simply cannot find that Plaintiff's age played any role in his alleged discipline or in Defendant's decision to terminate his employment. Plaintiff therefore has failed to make out a prima facie case of age discrimination.

Likewise, while we can imagine that the remarks alleged to have been made by Plaintiff's two co-workers were annoying and hurtful, we cannot find that they were intimidating or so severe or pervasive as to alter the conditions of his employment and create an abusive working environment. Again, Plaintiff himself stated that the remarks were not made by any of his managers and that Dannehower "addressed" the matter of the co-worker's comments by, *inter alia*, requiring that the offending employees receive re-training on proper workplace behavior. (PL's Dep.,

pp. 385-386).  We therefore conclude that Plaintiff's claim for
a hostile, ageist environment also cannot withstand summary
judgment.

Finally, there is also no evidence to sustain Plaintiff's
claim that Defendant retaliated against him on the basis of his
age or because he complained of age discrimination.  Yet again,
Plaintiff admits that he has no direct evidence that he was
terminated because of his age complaint - he simply believes
that he was fired because he was a "squeaky wheel," and that
Dannehower was "really getting tired of it."  A subjective
belief or feeling is not evidence, however.  For all of these
reasons, judgment as a matter of law shall be entered in its
entirety in favor of Defendant and against Plaintiff on Count II
of the Complaint.

*C.  Count III - Violation of Pennsylvania Wage Law*

In Count III of his Complaint, Plaintiff asserts a claim
under the Pennsylvania Wage Payment and Collection Law, 43 P.S.
§260.1, *et. seq.* ("WPCL"). That statute states in relevant part:

> … Every employee shall pay all wages, other than fringe
> benefits and wage supplements, due to his employees on
> regular paydays designated in advance by the employer.
> Overtime wages may be considered as wages earned and
> payable in the next succeeding pay period.  All wages,
> other than fringe benefits and wage supplements, earned in
> any pay period shall be due and payable within the number
> of days after the expiration of said pay period as provided
> in a written contract of employment or, if not so
> specified, within the standard time lapse customary in the
> trade or within 15 days from the end of such pay period.

> The wages shall be paid in lawful money of the United States or check, except that deductions provided by law, or as authorized by regulation of the Department of Labor and Industry for the convenience of the employee, may be made including deductions of contributions to employee benefit plans which are subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et. seq.

43 P.S. §260.3(a). Pursuant to 43 P.S. §260.9a(a), "[a]ny employee or group of employees, labor organization or party to whom any type of wages is payable may institute actions provided under this act." Thus, it is clear from the language of the statute that the WPCL does not create a statutory right to compensation, [but] rather provides a statutory remedy when the employer breaches a contractual right to earned wages." Yablonski v. Keevican Weiss Bauerle & Hirsch LLC, 197 A.3d 1234, 1238 (Pa. Super. 2018)(quoting Braun v. Wal-mart Stores, Inc., 2011 PA Super 121, 24 A.3d 875, 957 (Pa. Super. 2011)(*per curiam*). "Claims for violation of the WPCL are entirely contingent upon proof of a contractual obligation to pay wages and an attendant breach of that obligation." Diodato v. Wells Fargo Insurance Services, 44 F. Supp. 3d 541, 559 (M.D. Pa. 2014)(citing Sheils v. Pfizer, Inc., 156 Fed. Appx. 446, 451-452 (3d Cir. 2005)).

In applying these legal principles to the case now before this Court, we again find that evidentiary support for this claim is lacking. To be sure, the only evidence in this record on this point consists of Plaintiff's deposition testimony that

he was to have been paid at the rate of 5/10 (1/2) per flat rate hour for anytime when he assisted co-workers in the performance of their repair jobs regardless of whether it took him two minutes or an hour of his time. (Pl's Dep., pp. 170-175). Although Plaintiff stated several times that he was never paid for this time, he acknowledged that he didn't keep notes on when he should have been paid but wasn't and that sometimes his pay was adjusted to include the time. (Pl's Dep., pp. 180-185). Given that it is incumbent upon the plaintiff to produce more than a scintilla of evidence in opposition to a motion for summary judgment and that he can no longer rely upon mere assertions, we cannot find a breach of a contractual duty to pay from the foregoing testimony.[7] Accordingly, summary judgment shall also be entered in Defendant's favor on Count III of the Complaint

> D. *Count IV - Common Law Wrongful Discharge*

Finally, in Count IV of his Complaint, Plaintiff alleges that he was also terminated because he suffered an injury at work on May 24, 2018 which necessitated that he be treated at the local hospital and follow-up with Defendant's workers' compensation physician. As a result of his injury, Plaintiff was out of work until June 6, 2018.

---

[7] Plaintiff also does not address Defendant's arguments regarding Counts III and IV at all in his Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

"Pennsylvania has long subscribed to the at-will employment doctrine," pursuant to which "an employer 'may discharge an employee with or without cause, at pleasure, unless restrained by some contract.'" <u>Knox v. Board of School Directors of Susquenita School District</u>, 585 Pa. 171, 183, 888 A.2d 640, 647 (2005) (quoting <u>Henry v. Pittsburgh & Lake Erie Railroad Co.</u>, 139 Pa. 289, 297, 21 A. 157 (1891)). "Absent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." <u>Id</u>, (quoting <u>Geary v. U.S. Steel Corporation</u>, 456 Pa. 171, 175, 319 A.2d 174, 176 (1974)). There are, however certain "exceptions to this general rule that there is no common law cause of action against an employer for dismissal of an at-will employee where the dismissal would threaten clear mandates of public policy." <u>Shick v. Shirey</u>, 552 Pa. 590, 596, 716 A.2d 1231, 1234 (1998).

Given that the Workers' Compensation Act has been substituted for common law tort actions between employees and employers and is the exclusive means for obtaining compensation for work-related injuries, it does provide a basis for a public policy exception to the employment-at-will doctrine. <u>Id</u>, 552 Pa. at 603, 716 A.2d at 1237. However, the recognition of this exception does not obviate the requirement that Plaintiff demonstrate a causal connection between his workers'

compensation medical treatment and leave and the termination of his employment.  Here, Plaintiff again has offered no evidence to show such a connection and when asked repeatedly during his deposition whether he believed Defendant terminated him because of his work-related injury, he said he didn't know and didn't know how to answer.  (Pl's Dep., pp. 390-397).  In light of Plaintiff's testimony and lack of evidence,[8] we find that summary judgment is appropriately entered in favor of Defendant on Count IV as well.

## Conclusion

For all of the reasons outlined above, Defendant's Motion for Summary Judgment is granted in large part and denied only with respect to Plaintiff's claim that he suffered a retaliatory discharge for lodging his sexual harassment complaint.  An order follows.

---

[8] We reiterate that Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment is silent as to his wrongful discharge claim.